IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| Dennis Larson, a Minnesota resident, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANT'S** |
| | ) | **MOTION IN LIMINE** |
| vs. | ) | |
| | ) | |
| Gerald J. Martin, individually and d/b/a Martin & Son Construction, North Dakota residents, and Granite Re, Inc., an Oklahoma corporation, | ) | |
| | ) | Case No. 4:05-cv-047 |
| | ) | |
| Defendants, | ) | |
| | ) | |
| Granite Re, Inc., an Oklahoma corporation, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Goldleaf Financial, Ltd., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

Before the Court is Defendant Granite Re, Inc.'s Motion in Limine filed on September 7, 2006. The plaintiff, Dennis Larson, filed a response on September 28, 2006. Granite filed a reply memorandum on October 2, 2006. For the following reasons, the Court grants the motion.

I.   **BACKGROUND**

This lawsuit arises out of a road construction project for the Turtle Mountain Band of Chippewa Indians (the Tribe). The Bureau of Indian Affairs (BIA) was the owner of the project and the Tribe was the general or prime contractor. The Tribe sought to award the subcontract to a qualified tribe member and entered into contract negotiations with Gerald J. Martin, d/b/a Martin

1

& Son (Martin). Martin is an enrolled member of the Turtle Mountain Band of Chippewa Indians. On February 14, 2002, negotiations between Martin and the Tribe culminated in a "Notice of Award" indicating the Tribe's intent to enter into a contract with Martin. The "Notice of Award" contemplated a contract in the amount of $5,232,000 for the road construction project.

The record reveals that following the awarding of the contract, Martin contacted Dennis Larson (Larson), a 50% shareholder and president of Goldleaf Financial, Ltd. (Goldleaf), in an attempt to obtain bonding as required by the terms of the contract. Goldleaf is a Minnesota corporation which specializes in obtaining bond markets for contractors. During the course of Martin's negotiations with Larson, Larson offered to serve as a subcontractor and supplier of heavy equipment to facilitate the subcontract work for Martin. Thereafter, Larson entered into a separate subcontract with Paul Strom of Strom Construction of Brandon, Inc., (Strom) for the supply of various equipment to the project.

Following the awarding of the contract, Goldleaf sought to obtain bonding for Martin as required by the contract and contacted Granite Re, Inc., (Granite) who indicated its willingness to act as surety. Because the cost of the road construction project was significantly larger than any project Martin had undertaken before, Granite was unable to issue a bond for the full amount of the project, namely $5,232,000. Thereafter, in the spring of 2002, Martin, Goldleaf, Granite, the BIA and the Tribe participated in contract negotiations in an effort to obtain a bond for Martin that was acceptable to the BIA. The Tribe and Granite agreed to ostensibly break the project into six separate subcontracts of $886,404.81 each. On April 9, 2002, the Tribe and Martin attempted to enter into a subcontract for $886,404.81 which would represent one-sixth of the project. Bonds were solicited from Granite. Granite issued subcontract payment and performance bonds on April 26, 2002 for the

first one-sixth of the project. However, the BIA rejected the proposed six-part project division. As a result, on April 30, 2002, Granite voided the payment and performance bonds due to the lack of an executed subcontract. See Supplemental Affidavit of Jonathan Pate (Docket No. 82).

In May of 2002, after cancellation of the payment and performance bonds, and despite the absence of a bonded subcontract, Larson contacted the BIA to request permission to move certain heavy equipment to the project site on the Turtle Mountain Indian Reservation near Belcourt, North Dakota. Richard Zephier, a representative of the BIA, allegedly informed Larson that he should move the construction equipment to the project site in order to avoid losing two months of construction time due to imminent road restrictions that would be imposed. Road restrictions are governmental prohibitions on moving heavy vehicles on the roads in the spring when the roads are soft. Driving heavy vehicles at such times can cause damage to the roads. The road restrictions are generally imposed for about two months in the spring but the specific dates each year depend on the weather. The record reveals that during the phone conversation between Larson and the BIA, Larson handed the phone to Martin, who subsequently confirmed that Larson should indeed move the heavy equipment to the project site as soon as possible. See Deposition of Larson, p. 102. Thereafter, Larson instructed Strom to mobilize equipment on site in anticipation of a bonded subcontract. Despite the discontinuance of the road restrictions in early June of 2002, Strom's equipment and workers sat idle at the site until near the end of July of 2002. The record reveals that Strom's employees had no other realistic opportunities to work even if they had been able to leave North Dakota. See Deposition of Strom, p. 28.

At the end of July, 2002, the BIA, the Tribe, Goldleaf, Granite, and Martin reached an agreement to divide the project into three parcels with each project parcel to be bonded separately.

The Tribe entered into a subcontract with Martin on July 23, 2002, for work on the project in the sum of $1,696,588.39. Granite issued a subcontract labor and material payment bond the same day the contract was executed. On July 30, 2002, Strom received a letter to proceed with the project. See Deposition of Strom, p. 17.

Larson and Strom have asserted that they are owed $348,751 for "idle equipment" and "idle equipment operators"expenses rendered on this project from approximately April 2002 through July 22, 2002, or during the time period before the subcontract and the bond were executed. This amount includes a claim of $133,000 for Larson's own idle equipment but that claim was resolved through mediation. Because Martin is bankrupt, Larson and Strom seek payment from Granite, the surety. The amount that Larson seeks from Granite includes "pass through" costs and expenses that Strom incurred which are attributable to having idle equipment and idle equipment operators on the project site prior to July 23, 2002. Specifically, Larson seeks to introduce evidence of a claim of his subcontractor (Strom) for idle equipment and idle equipment operators on site in the amount of $264,702. See Affidavit of Strom dated April 29, 2005. The claim is essentially based upon the presence of idle equipment and idle equipment operators on site before the execution of a surety bond and a bonded subcontract. It is undisputed that the equipment was transported to the project site by Strom, at the behest of Larson and the BIA, and in anticipation of an executed contract and an executed subcontract bond. It is also undisputed that no subcontract or bonds were in force at the time Larson orchestrated the mobilization of the equipment. Granite seeks to exclude any evidence of Strom's "pass through" claim based upon idle equipment and idle equipment operators on location prior to July 23, 2002.

**II.     LEGAL DISCUSSION**

This case is in federal court based on diversity jurisdiction. Therefore, North Dakota law controls. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Section 22-03-03 of the North Dakota Century Code provides the limitations on liability of a surety and states that "[a] surety cannot be held beyond the express terms of the surety's contract...." It is well-established that the duty of an issuer of a performance bond is prescribed by the language of the bond. See Angelo Iafrate Const. v. Potashnick Const., 370 F.3d 715, 719 (8th Cir. 2004) (explaining that surety's duty is established by the language of the bond); Home Indemnity Co. v. State of Missouri, 78 F.2d 391, 393 (8th Cir. 1935).

It is clear that before a surety may be held liable on a contract, a contract must exist to delineate the scope of the surety's obligations. Although Granite issued a subcontract payment and performance bond as early as April 26, 2002, the bond was voided in its entirety by Granite on April 30, 2002. The subcontract representing one-sixth of the project in the amount of $886,404.81 was deemed unacceptable by the BIA and was expressly rejected. Thereafter, the Tribe executed a subcontract with Martin on July 23, 2002. Granite's first valid performance and payment bonds were issued on July 23, 2002. It is from that date that Granite assumed liability under the contract.

Larson contends that the purpose of the payment and performance bonds is to insure payment of costs incurred during the course of construction, and that payment and performance bonds are a specialized form of insurance which is prospective and retrospective from the contract date. "It is an elemental rule of construction that a statute ought not to be construed to operate retrospectively in the absence of clear, strong, and imperative language commanding it." Home Indemnity Co. v. State of Missouri, 78 F.2d 391, 393 (8th Cir. 1935); Petters & Co. v. Nelson County, 281 N.W. 61,

64 (N.D. 1938). Further, it is a well-recognized and established that "a contract of suretyship will not be construed to be retrospective in operation, in the absence of plain language manifesting the assumption of such an obligation." Home Indemnity Co. v. State of Missouri, 78 F.2d 391, 393 (8th Cir. 1935). Simply stated, in the absence of contractual language to the contrary, surety bonds are prospective, not retrospective, in nature.

The language of the surety bond obligates Granite for labor and material costs used or reasonably required for use in the performance of the subcontract. As previously noted, the subcontract was entered into on July 23, 2002. There is no indication from the bond or the underlying contract that the bond was to be applied retrospectively. The Court finds that evidence of Strom's "pass through" claim for costs, idle equipment, and idle equipment operators expenses incurred prior to July 23, 2002, lacks relevance and is inadmissible. Such claims are clearly not covered by Granite's payment and performance bond. Any claims submitted on behalf of Strom for the value of the idle equipment and idle equipment operators on site on this road construction project prior to July 23, 2002, should be pursued against the BIA, Gerald Martin, and/or Dennis Larson rather than against the surety. There was neither a subcontract nor a bond in force at the time the equipment was mobilized.

### III.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant Granite Re, Inc.'s Motion in Limine. The Court will not allow any evidence at trial of Strom's "pass through" claims for costs, idle equipment, and idle equipment operators expenses incurred on the project prior to July 23, 2002.

**IT IS SO ORDERED**

Dated this 3rd day of October, 2006.

                                                       */s/  Daniel L. Hovland*
                                                      Daniel L. Hovland, Chief Judge
                                                     United States District Court