## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## NORTHWESTERN DIVISION

| | |
|---|---|
| Dennis Larson, a Minnesota resident,) | |
| ) | |
| Plaintiff, ) | **FINDINGS OF FACT, CONCLUSIONS** |
| ) | **OF LAW, AND ORDER FOR JUDGMENT** |
| vs. ) | |
| ) | |
| Gerald J. Martin, individually and ) | |
| d/b/a Martin & Son Construction, ) | |
| North Dakota  residents, and ) | |
| Granite Re, Inc., an Oklahoma ) | |
| corporation, ) | Case No. 4:05-cv-047 |
| ) | |
| Defendants, ) | |
| ) | |
| Granite Re, Inc., an Oklahoma ) | |
| corporation, ) | |
| ) | |
| Third-Party Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| Goldleaf Financial, Ltd., ) | |
| ) | |
| Third-Party Defendant. ) | |

_____

This matter was tried before the Court on October 10-11, 2006, in Bismarck, North Dakota.

The plaintiff, Dennis Larson, was represented by attorney Marvin T. Fabyanske.  The defendant and

third party plaintiff, Granite Re, Inc., was represented by attorneys David Gregorson and Joseph

Nylan.  Based upon the evidence introduced at trial and the arguments of counsel, the Court makes

the following Findings of Fact, Conclusions of Law, and Order for Judgment.

**FINDINGS OF FACT**

1.      The plaintiff, Dennis Larson ("Larson"), is a resident of the State of Minnesota, and at all material times was Chief Executive Officer and 50% shareholder of Goldleaf Financial, Ltd. and Goldleaf Escrow, LLC, a Minnesota corporation and a Minnesota limited liability company, respectively.

2.      The defendant, Gerald J. Martin ("Martin"), is a resident of Belcourt, North Dakota, and an enrolled member of the Turtle Mountain Band of Chippewa.  Martin at all material times was engaged in the construction business.

3.      The defendant, Granite Re, Inc. ("Granite"), is an Oklahoma corporation with principal offices located in Oklahoma City, Oklahoma.  Granite is engaged in the business of providing contractor surety bonds.

4.      The defendant, Goldleaf Financial, Ltd., is an insurance agency specializing in providing surety bonds for contractors.

5.      In 2001, Martin contacted Larson at Goldleaf Financial, Ltd. regarding the anticipated need for a subcontract payment bond and performance bond in contemplation of a road construction project on the Turtle Mountain Indian Reservation near Belcourt, North Dakota (the "Project").

6.      The construction of the Project was originally estimated to cost in excess of $5,000,000.  It involved grading, aggregate surfacing, drainage structures, water lines, and incidental items.   The roadway was in excess of six miles long.  It was estimated that the Project would take two or three construction seasons.  The work on the Project was expected to begin in the spring of 2002 when the frost came out of the ground and the site became suitable for construction.

7.      According to the contract between the Bureau of Indian Affairs (BIA) and the Turtle Mountain Band of Chippewa Indians (Tribe), the Tribe was to act as the general contractor on the Project. The contract anticipated that the Tribe would hire one or more subcontractors to actually perform the work. See Ex. P-9, P-16. The Tribe hired Martin & Son Construction to build the Project. Martin & Son Construction was owned by Gerald J. Martin, an enrolled member of the Tribe.

8.      Gerald Martin hired several subcontractors to perform work on the Project. One of the subcontractors was Terry Marion who was also a member of the Tribe. Marion was hired to perform all of the underground work. On March 8, 2002, Martin also entered into a subcontract with Dennis Larson ("Larson"). See Ex. P-7. Larson's work included excavating, hauling, and embanking dirt from and to designated locations on the site using large, earth-moving machines called scrapers. It was expected that Larson's scraper work would be used primarily for the shorter haul distances of one-half mile or less. Martin intended to do the excavating, hauling, and embanking of material that had to be hauled further than one-half mile using trucks which were more efficient for longer hauls.

9.      When Larson entered into a contract with Martin on March 8, 2002, Larson knew that Martin had not yet entered into a binding contract with the Tribe, and Larson knew by virtue of his work as an insurance agent that a surety bond had not been secured for Martin. Larson admitted at trial that Martin did not have the equipment, the working capital, or the experience and qualifications to undertake this road construction project. Larson also admitted that he knew Martin was an "at risk" contractor.

10.     On March 15, 2002, the BIA awarded a $5,229,788.40 contract to the Tribe for the improvement of Route 6, Martin Lake Road in Belcourt, North Dakota (the "Project").

11.     In March of 2002, Larson agreed to act as a supplier of heavy equipment to Martin for use on the Project because Martin did not have the necessary equipment needed to successfully complete the work.  Martin also entered into equipment lease agreements with Larson for several items of equipment which Martin needed in order to construct the Project.  See P-24.

12.     In March of 2002, Larson entered into an agreement with Strom Construction of Brandon, Minnesota ("Strom Construction") for the performance of the excavation work which Larson had agreed to do for Martin.   See Ex. P-4.  Strom Construction is a small excavation contractor which owned the scrapers needed for the performance of the work.  This was considered to be a large project for Strom Construction.

13.     In its contract with the Tribe, the BIA required that any contractor hired by the Tribe to perform work on the Project provide payment and performance bonds in the full amount of the contract price.  The Tribe's selected contractor, Martin, was a small contractor with very limited road construction experience and no established line of bond credit.  The record clearly reveals that Martin was neither competent nor capable of completing the work on the Project.  Martin sought help in procuring surety bond credit from Goldleaf Financial, Ltd. ("Goldleaf").

14.     In 2002, Goldleaf was a relatively small and new company, owned in part by Larson who was its president.  Goldleaf's business was to help small contractors procure surety credit.  This was done, in part, by offering to sureties guarantees which provided limited indemnity against losses resulting from the issuance of the bonds.  Goldleaf also offered material guarantees and "fund control" or escrow services which assured that funds distributed by a project owner were properly

used to pay project obligations to subcontractors and suppliers. Goldleaf acted as both a surety agent, putting its customers in touch with sureties that specialize in writing bonds for smaller businesses, and as a broker or middle man between its customers and another surety agent that had access to specialty sureties.

15.     When it was first in business, Goldleaf sent much of his business to Jonathan Pate, the owner of Pate Agency. Pate was an agent for and had a power of attorney from a small number of specialty sureties which wrote smaller bonds for smaller contractors. One of those sureties, Granite Re, Inc., ("Granite") was owned, in part, by Pate. A significant portion of the bonds that Pate wrote as an agent were written on behalf of Granite.

16.     The evidence reveals that Goldleaf referred Martin to Pate. Thereafter, Goldleaf (namely, Dennis Larson) collected background and financial information concerning the Project and Martin and sent the information to Pate along with a request that the bonds be issued for Martin. When Larson went to Belcourt to gather background information on Martin, he admittedly determined that Martin had no equipment, no money, no ability to obtain a bond, and was essentially incompetent. As an inducement to Pate, Goldleaf offered to set up an escrow account on the Project to assure control of the Project funds, and Goldleaf provided a limited (15%) guarantee on the bonds. See Ex. D-33. Goldleaf charged a fee of 1-3% of the total contract price to set up an escrow account. Goldleaf also charged Martin a separate fee of $177,000 to place a bond through Pate which amounted to 3% of the total contract price. Pate received a commission of $3,000 for his services to Granite as a bonding agent.

17.     At first, Pate had no interest in providing bonds to Martin because of the size of the Project. Because of its relatively small size and its re-insurance limitations, Granite could only write

bonds for projects less than two million dollars. Pate had no authority to write a bond larger than two million dollars on behalf of Granite. In addition, Pate did not believe that Martin was qualified to handle a project larger than two million dollars which was in fact an accurate assessment of Martin's minimal capabilities.

18.     The evidence reveals that the Tribe was determined to have Martin, an enrolled tribal member, undertake the Project despite Martin's lack of competence and capability to complete the necessary work. In order to accommodate Martin's limited ability to procure bond credit, it was suggested that the Project be divided into six parcels or segments, each of which would be the subject of a separate contract and separate bonds. The Tribe and Martin both agreed to the six-part subdivision of the Project. In April, 2002, Pate wrote bonds for the first one-sixth of the Project. See Ex. P-10, P-11.

19.     Before writing the Granite bonds for Martin, Pate did not undertake an independent investigation of Martin and conducted no independent underwriting. Pate admittedly relied upon the scant information presented to it by Goldleaf, i.e., Dennis Larson. At the time Pate issued the bonds to Martin on behalf of Granite, Pate had never met or talked to Martin; Pate did not know where the funding was going to be coming from for the Project; Pate did not know that the BIA was involved on the Project; Pate did not know what work was involved on the Project; Pate did not know what equipment Martin had or would need in order to construct the Project; Pate did not know what subcontractors would be hired; and Pate did not know if Martin had any working capital.

20.     The contract between the BIA and the Tribe provided that any agreement that the Tribe entered into with contractors would be subject to BIA approval. The BIA did not approve of breaking the Project into six parcels or segments and providing six separate bonds. The BIA

initially insisted upon a single bond equal to the full contract value which was in excess of $5 million dollars.  See Ex. P-12.  When the BIA rejected the six-parcel approach, the bonds which Pate had issued were sent to Granite's home office in Oklahoma.  The original bonds never left Pate's office.

21.     In the spring of 2002, the BIA raised questions concerning the size of the bonds.  See Ex. P-12.  The BIA also questioned the Tribe's method of selecting Martin as the contractor.  In addition, there appeared to be an intra-tribal dispute over Martin's selection and questions about the continuity of tribal leadership.   The BIA expressed reservations about making any final commitments on the Project so long as these issues were outstanding.

22.     Eventually, the issues between the BIA and the Tribe were resolved by breaking the Project into three parcels, having three separate contracts between the Tribe and Martin for each of the parts, and issuing three sets of payment and performance bonds.  In July 2002, a downsized contract between the BIA and the Tribe was signed (Ex. P-17) for the first one-third of the Project, an upsized contract between the Tribe and Martin was signed (Ex. P-16), and Granite issued new payment and performance bonds.  See Ex. P-14, P-15.

## MOBILIZATION

23.     In late February or early March of 2002, Gerald Martin met with BIA representatives in Aberdeen, South Dakota.  At the time of the meeting, it was anticipated that work on the Project would begin in early May 2002.  Because North Dakota imposes restrictions on the weight of vehicles that can drive on North Dakota highways during spring thaw, there is a period of time every year (usually April and May) when heavy construction equipment cannot be transported.  See Ex.

D-77.  Martin and the BIA agreed that Martin should arrange for the mobilization of the heavy construction equipment to be used on the Project before road restrictions went on so the equipment would be on-site and available to as soon as the BIA issued a notice to proceed.  A BIA representative and Martin called Larson and told him to mobilize.  Thereafter, Larson called Paul Strom and ordered Strom to mobilize his equipment.

24.     In early March of 2002, both Larson and Strom transported their heavy equipment to the Project site near Belcourt, North Dakota.  This mobilization occurred <u>before</u> a contract was ever signed between the Tribe and Martin <u>and</u> <u>before</u> the issuance of payment and performance bonds.

25.     At the time of equipment mobilization in March of 2002, Larson knew that there was no contract in force between Martin and the Tribe, and Larson knew that no payment and performance bonds were in force.

26.     When the equipment was mobilized to the site in March of 2002, it was expected that it would sit idle until early May 2002 when work would commence.  No notice to proceed was issued at that time.  The issues concerning the bonding, the subdivision of the Project, the Tribes' selection of Martin as a subcontractor, and intra-tribal issues remained unresolved.

27.     On April 9, 2002, the Tribe and Martin attempted to enter into a subcontract in the sum of $886,404.81 which represented one-sixth (1/6) of the Project.  However, the subcontract was deemed unacceptable and refused by the BIA.

28.     At that time, Larson, acting as an insurance agent and CEO of Goldleaf, solicited Granite in an effort to obtain bonding for Martin.  Larson had previous experience as CEO of Goldleaf with Granite in securing surety bonds from Granite for contractors represented by Goldleaf.

8

Needless to say, Larson's involvement in this entire transaction is highly suspect at best and plagued by numerous potential conflicts of interest.

29.     On April 26, 2002, Granite faxed a copy of the proposed subcontract bonds in the sum of $886,404.81 to Larson at Goldleaf.  The original bond documents relating to Granite's fax copies of April 26, 2002, were never released by Granite or signed by Martin as the bond principal. Granite's proposed April 26, 2002, bonds were voided internally on April 30, 2002.  The originals were warehoused in Granite's cold storage.

30.     Strom and Martin were unable to move their equipment from the Project site until June 3, 2002, when road restrictions were lifted in the Belcourt area.  (See D. 77.)  Neither Strom nor Larson had other projects to which they could move their equipment due, in part, to their commitments to undertake the Project.

31.     By mid-June 2002, no notice to proceed had been issued.  Because of continuing concerns over the delay in getting started, the Tribe and Martin approached the BIA and requested permission to proceed with some of the preliminary work on the Project, including clearing and grubbing.  The BIA approved of the proposal and Martin proceeded with that work.  See Ex. P-13.

32.     On or about July 15, 2002, when the resolution of the bonding and contract issues seemed to be imminent, Martin ordered Larson to mobilize the equipment operators to the site so they would be ready to start work.  In turn, Larson ordered Strom to mobilize his men and equipment. See Ex. P-3, (July 13 entry).  Strom's employees, which consisted of three operators and their supervisor (Brad Barry), arrived on the site on July 15, 2002.  From July 15, 2002, until the notice to proceed was received on July 30, 2002, Strom's employees had no work to do, but Strom paid them for working 12 hours per day.  See Ex. P-18, P-19.

9

33.     On July 23, 2002, the BIA and the Tribe amended the contract reducing the contract amount from $5,229,788.40 to $1,778,076.39 to allow for the contract work to be constructed in three phases under three separate contracts.

34.     On July 23, 2002, the Tribe and Martin entered into a subcontract in the amount of $1,696,588.39 for a portion of the first phase of the Project.

35.     On July 23, 2002, Granite executed and issued payment and performance the bonds naming Martin as bond principal and the Tribe as bond obligee in the sum of $1,696,588.39. Granite's payment and performance bonds, by their terms, bonded the July 23, 2002, subcontract between Martin and the Tribe.

36.     At no time prior to July 23, 2002, did Larson disclose to Granite representatives that Larson was engaged as a subcontractor to Martin or that Larson intended to supply equipment to Martin for use on the Project site.  As noted, Larson's questionable role in this construction nightmare borders on the unethical and was plagued with numerous potential conflicts of interest.

37.     The equipment and equipment operators supplied to the site at Larson's express direction remained idle until after July 23, 2002.  No physical improvement to the Project was undertaken by Larson or Strom prior to July 23, 2002.

38.     At no time prior to July 23, 2002, did Larson inform representatives of Granite that idle equipment and idle equipment operators were on site or that claims could be or may be asserted against Granite's surety bonds for the alleged damages sustained and losses incurred by Larson for idle equipment and idle equipment operators on site prior to the execution of the bonds.

39.     The evidence reveals that Granite would not have executed and issued subcontract payment and performance bonds if it had known that Larson was a supplier and subcontractor to

10

Martin; that idle equipment was moved on site in March 2002; that idle equipment operators were moved on site on July 15, 2002; or that there were potential claims for equipment and operators on site.

40. During the course of the Project, Larson individually, and through Goldleaf, worked as a subcontractor to Martin; provided heavy equipment to Martin; hired subcontractors and suppliers for Martin; loaned funds to Martin to finance Martin's operations; acted as escrow agent for the receipt, control, and disbursement of earned contract funds; extended cash collateral to secure bonding; and acted on a limited basis as an indemnitor of Martin. Surprisingly, Larson testified that he did not have any conflicts of interest in undertaking these various duties and responsibilities. Needless to say, Larson's self-dealing and self-serving conduct and involvement in this entire project is suspect and troublesome.

41. On July 30, 2002, a notice to proceed was issued. The work on the Project began immediately.

## MARTIN'S LACK OF SUPERVISION

42. At about the same time that work was starting on the Project, Martin realized that none of his employees had the experience or knowledge required to plan and supervise the overall construction of the Project. Martin, Larson and Strom met and agreed that Strom's foreman, Brad Barry, had the requisite qualifications, and that he could provide overall project supervision. Barry was an experienced construction manager and a farm mechanic by education. When asked to take on the expanded role, Barry agreed but asked for a raise from $25 an hour to $35 an hour. See Ex. P-3 (July 13 entry). Barry said this was the biggest project that he had been involved in with Strom

11

Construction.  Barry was an honest and straight-forward witness who said that he sensed major problems with the project and wanted to pull out of the project in mid-July 2002.

43.    Strom charged Larson $70 per hour for Barry's time.  The $70 per hour charge included Barry's wages and related insurance coverages, social security taxes, Medicare and Medicaid, and similar costs.  The charge also included the costs of Barry's pickup truck, his surveying equipment and small tools.

44.    Strom charged Larson a total of 473 hours for Barry's supervisory time in 2002.  At $70 per hour, the total charge came to $33,110.  See Ex. P-21.  A dispute arose over the charge, but it was settled by Strom ultimately agreeing to reduce the charge to $24,000, with Larson agreeing to pay $10,000 of the $24,000 owed, and Martin agreeing to pay $14,000 of the $24,000.  Larson paid his $10,000 share.  Martin has not paid his $14,000 share of the settlement.

## **LONG HAUL**

45.    In early 2002, Paul Strom made a pre-bid visit to the site and met with Gerald Martin to review the Project.  They discussed the fact that there was a large cut area near the beginning of the Project and a large fill area approximately 1/3 of the way into the six mile road project.  In between the large cut and the large fill, there were a series of smaller cuts and fills that were closely-spaced.  Martin and Strom agreed that Martin's trucks and excavators were better suited for the longer haul between the large cut and the large fill.  They also agreed that Strom's scrapers complimented Martin's trucks and excavators because they were better suited for the more closely-spaced and smaller cuts and fills in between.  It was on that basis they agreed to approach the Project and Strom submitted a bid to Larson for his portion of the work on the Project.  Martin assured

12

Strom that all of the Project in between the large cut and the large fill could be opened up and worked on at the same time.

46.     In mid-July, 2002, the BIA informed Martin that because of concerns over excessive erosion and potential environmental problems, they would not permit Martin to open up more than 350,000 square feet of the Project at any given time.  See Ex. P-3 (July 12 entry).  That limitation meant that Strom could either work on shorter hauls in the smaller cuts and fills or that Martin could work on hauling in between the large fill and the large cut.  However, both operations could not go on concurrently without violating the 350,000 square foot limitation.  As a result, Martin opted to proceed with the long haul work.

47.     Rather than have his equipment and men continue to sit idle on the Project, Strom offered to help Martin with the long haul work using his scrapers.  The movement of dirt for distances in excess of one-half mile is commonly referred to as "long haul."  Because Strom bid the scraper work on the basis of shorter hauls, i.e., less than one-half mile one way, Strom announced that he would need an additional 41¢ per cubic yard for the long hauls.  Martin apparently agreed in that arrangement.  Larson testified that the long-hauls started after July 28, 2002.  Paul Strom testified that the first long-haul of dirt occurred on August 2, 2002.

48.     During the remainder of 2002, Strom kept a daily accounting of the number of cubic yards hauled further than one-half mile.  Between August 2, 2002, and October 7, 2002, a total of 170,852 cubic yards of material were hauled further than one-half mile.  Strom billed Larson at 41¢ per cubic yard for the 170,852 cubic yards for a total billing of $70,049.32.  See Ex. P-21, P-27. Larson then billed Martin for the same amount.  No part of that charge has ever been paid to Strom.

## THE IDLE EQUIPMENT CLAIM

49.     When Larson and Strom were ordered to mobilize their equipment to the work site in early March of 2002, both expected that their equipment would sit idle until the frost came out of the ground and they would be able to go to work.  Both reasonably expected that they would be able to start work in early May 2002.  Because of the delays in getting started as described above, the equipment continued to sit idle.  They were not authorized to proceed with the work until July 30, 2002.

50.     Because of delays in getting started with the Project, Strom calculated that from May 9, 2002, to July 15, 2002, his three scrapers sat idle for a total of 10 weeks.  At 60 hours per week, that amounted to 600 hours of idle time for each of the three scrapers.  Strom billed Larson for the 600 hours of idle scraper time at the rate of $116 per hour for each of the scrapers, and Larson passed the claim on to Martin.  See Ex. P-23.

51.     Strom's regular rental charge for a scraper was $120 per hour exclusive of any operator cost, but including fuel and maintenance.  See Ex. P-5.  Strom arrived at the $116 per hour charge for the idle scrapers by charging a reduced hourly rate for the scraper (to reflect the fact that it was not consuming fuel and did not need ongoing maintenance) and then adding to that reduced hourly equipment charge a portion of the wages that he was paying to each scraper operator.  The three scraper operators were continuously employed by Strom throughout the idle equipment time frame.  However, because they had no scrapers to operate, they were given other tasks on a variety of projects or simply given the task of sweeping the floor in the shop while they were waiting to go to work on the Project.

14

52.     Strom contends that he had no meaningful opportunity to mitigate the damage that he suffered in the first part of the 2002 construction season by having his equipment sit idle. Because of road restrictions, Strom claims that he could not move his equipment off the Project site until early June 2002.  Even when he had the ability to move the equipment, Strom claims that he was receiving regular assurances from Larson that the Project would start up at any time.  Strom said that he was concerned that if he moved his equipment off the Project and undertook other work, he may become double booked.

## THE IDLE MEN AND EQUIPMENT CLAIM

53.     On July 13, 2002, Larson directed Strom to get his equipment operators on the Project site by Monday, July 15, 2002.  Larson assured Strom that the operators would be paid even if they could not start work.  See Ex. P-3 (July 13 entry).

54.     On July 15, 2002, Strom's three operators and his foreman (Brad Barry) were all on the Project site but they had no work to do.  The three scrapers and four men were not authorized to proceed with the work until mid-morning on July 30, 2002.  See Ex. P-3 (July 30 entry).

55.     Strom charged Larson, and Larson charged Martin, for the three scrapers and three operators sitting idle for 136.5 hours at $116 per hour for a total charge of $47,502.  See Ex. P-27. Strom charged the same rate per hour as he had charged for the 600 hours of idle time from May to July 2002 even though the July idle time included all of the operators' wages.  For Barry's time, Strom charged Larson 120 hours at $70 an hour for a total of $8,400.  See Ex. P-27.

56.     A summary of Strom's claim against Larson which Larson is asserting against Granite in this lawsuit is as follows:

| | | |
|---|---|---|
| Idle scraper time from 5/9/2002 to 7/15/2002 | 3 scrapers at 600 hours each at $116/hr. | $208,800.00 |
| Idle scraper and operator time from 7/15/2002 to 7/30/2002 | 3 scrapers and 3 operators at 136.5 hours at $116/hr per scraper / operator combination | 47,502.00 |
| Brad Barry's idle time in July 2002 | 120 hours at $70/hr | 8,400.00 |
| Brad Barry's supervisory time | Martin's share of the settlement | 14,000.00 |
| Long scraper hauls | 170,852 c.y. at 41¢ per c.y. | 70,049.32 |
| | **Total Claims:** | **$348,751.32** |

57.     Each of the claims asserted by Strom reflect fair and reasonable charges.  There was no evidence presented at trial which suggested that any of the charges, hours, or rates were overstated or unreasonable.


## THE PAYMENT BOND

58.     On July 23, 2002, Pate, on behalf of Granite, issued a subcontract labor and material payment bond.  The bond was conditioned on the principal (Martin) promptly making ". . . payment to all claimants as hereinafter defined, for all labor and materials used or reasonably required for use in the performance of the subcontract . . ."  See Ex. P-15.  The bond defines "claimant" as ". . . one having a direct contract with the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the subcontract."

16

59.     Larson made a claim against the bond for amounts which he claimed were owed to him and also for the amount which Strom had claimed against Larson.  Larson's claim on the bond was not paid, and Larson timely commenced an action against Granite.

## CLAIMS LIQUIDATION AND PROSECUTION AGREEMENT

60.     On April 18, 2005, Larson and Strom entered into a Claims Liquidation and Prosecution Agreement.  See Ex. D-67.  Pursuant to that agreement, Larson undertook to prosecute Strom's claims, along with Larson's own claims, against Martin and Granite.  For some strange reason, Strom agreed that he would seek no recovery from Larson in excess of what Larson recovered from Martin and Granite on Strom's behalf.[1]  Strom and Larson also agreed that if Larson settled his own claims but did not settle Strom's claims, that Strom would become responsible for the prosecution of his own claim albeit in Larson's name.

61.     At some point during the pendency of this action, Martin filed bankruptcy and ceased to play any further active role in the litigation.  In August of 2006, all of the claims which were asserted in this litigation were settled with the sole exception of Strom's claims.  Following that settlement, Strom undertook the prosecution of his own claims, in Larson's name, against Granite.

---

[1]  There is little question that Gerald Martin was an incompetent contractor and that Dennis Larson became involved in this potentially lucrative road construction project on the reservation to take financial advantage of Martin's incompetence.  Larson was the only person who benefitted from this fiasco.  Strom Construction had valid claims against Dennis Larson for the losses sustained on this project.

17

## CONCLUSIONS OF LAW

1.     This case is in federal court based on diversity jurisdiction.  Therefore, North Dakota law controls.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Section 22-03-03 of the North Dakota Century Code provides the limitations on liability of a surety and states that "[a] surety cannot be held beyond the express terms of the surety's contract...."  It is well-established that the duty of an issuer of a performance bond is prescribed by the language of the bond.  See Angelo Iafrate Const. v. Potashnick Const., 370 F.3d 715, 719 (8th Cir. 2004) (explaining that surety's duty is established by the language of the bond); Home Indemnity Co. v. State of Missouri, 78 F.2d 391, 393 (8th Cir. 1935).

2.     Before a surety may be held liable on a contract, a contract must exist to delineate the scope of the surety's obligations.  Although Granite issued a subcontract payment and performance bond as early as April 26, 2002, the original bond documents were never released by Granite or signed by Martin as the bond principal.  Granite's proposed April 26, 2002, bonds were voided by Granite on April 30, 2002.  The subcontract representing one-sixth of the project in the amount of $886,404.81 was deemed unacceptable by the BIA and was expressly rejected.  On July 23, 2002, the BIA and the Tribe amended the contract reducing the contract amount from $5,229,788.40 to $1,778,076.39 to allow for the contract work to be constructed in three phases under three separate contracts.  On July 23, 2002, the Tribe and Martin entered into a subcontract in the amount of $1,696,588.39 for a portion of the first phase of the Project.  On July 23, 2002, Granite executed and issued payment and performance the bonds naming Martin as bond principal and the Tribe as bond obligee in the sum of $1,696,588.39.  Granite's payment and performance

bonds, by their terms, bonded the July 23, 2002, subcontract between Martin and the Tribe.  It is from that date that Granite assumed liability under the contract.

3.     Larson contends that the purpose of the payment and performance bonds is to insure payment of costs incurred during the course of construction, and that payment and performance bonds are a specialized form of insurance which are prospective and retrospective from the contract date.  "It is an elemental rule of construction that a statute ought not to be construed to operate retrospectively in the absence of clear, strong, and imperative language commanding it."  Home Indemnity Co. v. State of Missouri, 78 F.2d 391, 393 (8th Cir. 1935); Petters & Co. v. Nelson County, 281 N.W. 61, 64 (N.D.  1938).  It is a well-recognized and established that "a contract of suretyship will not be construed to be retrospective in operation, in the absence of plain language manifesting the assumption of such an obligation."  Home Indemnity Co. v. State of Missouri, 78 F.2d 391, 393 (8th Cir. 1935).  Simply stated, in the absence of contractual language to the contrary, surety bonds are prospective, not retrospective, in nature.

4.     The language of the surety bond obligates Granite for labor and material costs used or reasonably required for use in the performance of the subcontract.  The subcontract was entered into on July 23, 2002.  There is no indication from the bond or the underlying contract that the bond was to be applied retrospectively.

5.     At no time prior to July 23, 2002, did Larson disclose to Granite representatives that Larson was engaged as a subcontractor to Martin or that Larson intended to supply equipment to Martin for use on the Project site.  Larson's highly questionable role in this construction nightmare was plagued with a multitude of potential conflicts of interest.  The equipment and equipment operators supplied to the site at Larson's express direction remained idle until after July 23, 2002.

No physical improvement to the Project was undertaken by Larson or Strom prior to July 23, 2002. At no time prior to July 23, 2002, did Larson inform representatives of Granite that idle equipment and idle equipment operators were on site <u>or</u> that claims could be or may be asserted against Granite's surety bonds for the alleged damages sustained and losses incurred by Larson for idle equipment and idle equipment operators on site prior to the execution of the bonds.  The evidence reveals that Granite would not have executed and issued subcontract payment and performance bonds if it had known that Larson was a supplier and subcontractor to Martin; that idle equipment was moved on site in March 2002; that idle equipment operators were moved on site on July 15, 2002; or that there were potential claims for equipment and operators on site. Larson's claim for idle equipment and idle equipment operators onsite prior to July 23, 2002, cannot be sustained by a retroactive application of Granite's subcontract payment bond dated July 23, 2002.

6.     On July 30, 2002, a notice to proceed was issued and work on the project began immediately.  Shortly after the work started on the project, Martin realized that none of his employees had the experience or knowledge required to plan and supervise the overall construction of the project.  Martin, Larson, and representatives of Strom Construction met <u>and</u> agreed that Strom Construction's foreman (Brad Barry) had the necessary experience and qualifications to provide overall project supervision.  Strom charged Larson a total of 473 hours for Barry's supervisory time in 2002 which was incurred <u>after</u> the contract and bond had been executed.  The total charge for Barry's supervisory time after the execution of the contract and bond amounted to $33,110.  <u>See</u> Exhibit P-21.  A dispute arose over the charge but it was settled by Strom ultimately agreeing to reduce the charge to $24,000 with Larson agreeing to pay $10,000 of the $24,000 owed, and Martin agreeing to pay $14,000 of the $24,000 owed.  Larson paid his $10,000 share but Martin never paid

his $14,000 share of the settlement.  This amount is due, owing, and covered by the bond because it involves labor used or reasonably required for use in the performance of the subcontract which was incurred after July 23, 2002.  The plaintiff, Dennis Larson, is entitled to recover the amount of $14,000 from the defendant, Granite Re, Inc., for and on behalf of Strom Construction.

7.     Following the execution of the contract and the issuance of valid payment and performance bonds on July 23, 2002, Strom offered to help Martin with long-haul work on the project using their scrapers.  The movement of the dirt in excess of one-half mile is commonly referred to as "long-haul."  Strom initially bid the scraper work on the basis for shorter hauls, i.e., less than one-half mile one way, and Strom reasonably believed that he would need an additional .41 cents per cubic yard for the long hauls to which Martin agreed.  The long-haul movement of dirt was covered by the bond and involved labor and materials that were used or reasonably required for use in the performance of the subcontract.  The long-haul work started after July 28, 2002.  The first movement of dirt on a long-haul basis occurred on or about August 2, 2002.  During the remainder of 2002, and after the execution of the contract and the issuance of valid payment and performance bonds on July 23, 2002, Strom kept a daily accounting of the number of cubic yards hauled further than one-half mile.  Between August 2, 2002, and October 7, 2002, a total of 170,852 cubic yards of material were hauled further than one-half mile.  Strom billed Larson at a rate of .41 cents per cubic yard for the 170,852 cubic yards for a total of $70,049.32.  See Exhibit P-21, P-27.  Larson then billed Martin for that amount but no part of the charge has ever been paid to Strom.  This amount is due, owing, and covered by the bond because it involved labor or material used or reasonably requried for use in the performance of the subcontract which was incurred after July 23, 2002.

21

8.     The plaintiff, Dennis Larson, is entitled to recover the sum of $70,049.32 for long-haul services provided on this project by Strom Construction, and is entitled to recover such amount from the defendant, Granite Re, Inc., for and on behalf of Strom Construction.

## ORDER FOR JUDGMENT

The matter was submitted for the Court's consideration following a trial that occurred on October 10-11, 2006, in Bismarck, North Dakota.  The Court having considered the post-trial briefs and arguments of counsel, and after a careful review of the entire record, **ORDERS AS FOLLOWS:**

(1)     That judgment be entered against the defendant, Granite Re, Inc., and in favor of the plaintiff, Dennis Larson, in the amount of $84,049.32 ($14,000 + $70,049.32) for the benefit of Strom Construction for labor and materials provided on the road construction project after July 23, 2002.

(2)     That the plaintiff shall be awarded reasonable costs and disbursements plus interest in accordance with North Dakota law.

**IT IS SO ORDERED.**

Dated this 28th day of November, 2006.


*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court

22